UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at KNOXVILLE

| | | |
|---|---|---|
| ROBERT VAUGHN BRUCE, #294416 | ) | |
| | ) | |
| v. | ) | No. 3:06-cv-33 |
| | ) | *Judge Jordan* |
| | ) | |
| CORRECTIONAL MEDICAL SERVICES, | ) | |
| INC. | ) | |

## MEMORANDUM

On January 25, 2006, state inmate Robert Vaughn Bruce ("Plaintiff") filed a *pro se* complaint for damages and injunctive relief under 42 U.S.C. § 1983, alleging that, in 2002, he fell while working on the prison loading dock, injured his right hip and knee, and that, since that time, had been denied adequate medical attention by defendant Correctional Medical Services, Inc., ("Defendant" or "CMS"). More specifically, Plaintiff charged that CMS failed to provide the medical care recommended by Dr. Clary P. Foote, plaintiff's treating physician at the prison where he is incarcerated—a failure which has resulted in Plaintiff's suffering prolonged pain and permanent impairment.

CMS submitted a motion for summary judgment or, alternatively, a motion to dismiss and the supporting affidavit of Dr. Paul Alexander, the Medical Director of the Lois M. DeBerry Special Needs Facility (DSNF), a facility to which Plaintiff had been sent for medical care, (Doc. 35, Affidavit of Paul Alexander, M.D.). The Court treated CMS's filing as a motion for summary judgment, *see Dayco Corp. V. Goodyear Tire & Rubber Co.*, 523

F. 2d 389, 392-93 (6th Cir. 1975) ("[D]efendants' filing of affidavits with their motion essentially converted it into a motion for summary judgment."), and dismissed plaintiff's case. Plaintiff appealed the judgment order. The Sixth Circuit reversed the dismissal and remanded for the Court to make two determinations, upon Plaintiff's response to Defendant's dispositive motion, to wit, whether plaintiff was required to exhaust his administrative remedies and which actions taken by CMS are not barred by the applicable statute of limitations.

Plaintiff has offered his response to Defendant's motion and those determinations are ready to be made. The Court finds, for the reasons which follow, that CMS has failed to prove that Plaintiff did not exhaust his available administrative remedies, but that, since the claims raised in the complaint are time-barred, CMS's motion for summary judgment should be **GRANTED**.

## I.    EXHAUSTION OF ADMINISTRATIVE REMEDIES

In the brief accompanying CMS's motion for summary judgment, or in the alternative, motion to dismiss, CSM argues that Plaintiff failed to plead exhaustion in his complaint and failed to file appropriate documentation showing exhaustion of his available administrative remedies, thereby, justifying dismissal of the complaint, (Doc. 36 at 7).

### A.    Applicable Law

The Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), provides that no action shall be brought with respect to prison conditions under 42 U.S.C. § 1983 by a prisoner confined in any jail, prison, or other correctional facility until such administrative

2

remedies as are available are exhausted. If there is an administrative process that will review a prisoner's complaint, a plaintiff must exhaust the process. *Booth v. Churner*, 532 U.S. 731, 740-41 (2001). This holds true of all inmate suits about prison life, *Porter v. Nussle*, 534 U.S. 516, 532 (2002), even though money damages are not available through the administrative process. *Booth*, 532 U.S. at 740-41. To be "available," an administrative remedy must be "capable of use for the accomplishment of a purpose." *Id*. at 738 (citing Webster's Third New Int'l Dictionary 150 (1993)).

Although exhaustion of administrative remedies is mandatory, a prisoner need not plead or demonstrate exhaustion in his complaint. *Jones v. Bock*, 549 U.S. 199, 216 (2007). Instead, "[n]on-exhaustion is an affirmative defense under the PLRA, *with the burden of proof falling on the* [*defendant*]." *Surles v. Andison*, 678 F.3d 452, 455 (6th Cir. 2012) (quoting *Risher v. Lappin*, 639 F.3d 236, 239 (6th Cir. 2011) (emphasis added)).

## B. Analysis

In his complaint, Plaintiff maintains that "a damage action by a state prisoner can be brought under civil rights acts in federal courts without any requirements of prior exhaustion of state remedies." That is incorrect as a matter of law because, as noted above, the Supreme Court, in *Booth v. Churner*, held to the contrary. *Id*. at 740-41. However, in his response to CMS's dispositive motion, Plaintiff maintains, correctly, that it is not his burden to show exhaustion but instead, that CMS, as the party moving for summary judgment, bears the burden of establishing that there was an available administrative remedy which he failed to exhaust. *See Napier v. Laurel County, Ky.*, 636 F.3d 218, 225 (6th Cir. 2011) ("Because the

3

defendants moved for summary judgment on this defense, it was their burden to show that there was an absence of evidence to support the nonmoving party's case.") (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). More importantly, plaintiff suggests that CMS has failed to carry that burden because it has presented no evidence that there was an available administrative remedy, which he did not exhaust. The Court agrees.

As noted, CMS must make an affirmative showing that Plaintiff had an available state remedy which he failed to exhaust. Instead of meeting its burden, CMS pointed, in its summary judgment motion, to plaintiff as the one who needed to plead and prove exhaustion, and in effect, attempted to shift its burden to plaintiff. At one time, Sixth Circuit jurisprudence assigned to a prisoner the task of pleading and proving exhaustion of administrative remedies, *see Brown v. Toombs*, 139 F.3d.1102, 1103-04 (6th Cir. 1998), but inmates were relieved of that duty by *Jones v. Bock*, which overruled *Brown* and its progeny, *see Grinter v. Knight*, 532 F.3d 567, 578 (6th Cir. 2008), and which was decided on January 22, 2007—some eight months before CMS filed its summary judgment motion on September 14, 2007, (Doc. 35).

Thus, as the moving party, CMS was obliged to submit evidence to establish that Plaintiff had a grievance procedure available to him and that he did not exhaust his complaint regarding his medical care through that procedure. CMS, for example, might have explained the grievance system in its motion and submitted in support of the motion copies of the institutional grievance procedures or policy to show that there was an available administrative remedy. *See Hernandez v. CCA*, 2010 WL 1268033, *4 (N.D. Ohio 2010).

4

CMS could have augmented that proof by submitting affidavits of a prison authority who had reviewed Plaintiff's prison file or a record containing all grievances filed by inmates in that facility to testify that, even though a record was kept of all inmate grievances, there was nothing in Plaintiff's file or the institutional record to show that Plaintiff has filed a grievance, seeking to resolve his medical problems. Or CMS might have shown that other inmates making similar complaints regarding their medical care had utilized the grievance system. *Napier*, 636 F.3d at 220 (affirming district court's grant of summary judgment where defendants "demonstrated that the [jail's] remedies were available—both on paper and in practice"). However, if this kind of evidence existed, CMS did not present it.

Indeed, though Plaintiff had no *initial* burden to show exhaustion of available administrative remedies, the Sixth Circuit reviewed his pleading, noting that he alleged, in the journal attached to his complaint, that he attempted to file a grievance on July 11, 2003, but "was told Policy 501.01 would not allow it." *Bruce v. Corr. Med. Serv., Inc*., 389 Fed.Appx. 462, 467 (6th Cir. 2010). In *Napier*, the Sixth Circuit stated that a prisoner must make "some affirmative efforts to comply with the administrative procedures" before a court reaches the issue of whether "the facility rendered these remedies unavailable," and it cited to *Bruce* as a case where "the prisoner did something." *Napier*, 636 F.3d at 224. In *Owens v. Keeling*, 461 F.3d 763 (6th Cir. 2006), the Sixth Circuit held that "a prisoner is not required to pursue a remedy where the prison system has an across-the-board policy declining to utilize that remedy for the type of claim raised by the prisoner." *Id.* at 769. *Owens* involved a Tennessee prisoner and Policy No. 501.01—the same policy cited by

5

Plaintiff in his complaint and, in turn, by the Sixth Circuit in its decision to remand his case, as the reason for plaintiff's failure to offer his medical care complaints for resolution through the grievance process,[1] (Doc. 1-1 at 16-17).

Also, plaintiff indicates that, after he filed this action, he submitted an information request to the Warden's Office asking whether Policy 501.01, which contained exclusions of certain kinds of complaint from the grievance procedure, encompassed a complaint against an outside contractor and specifically questioning whether CMS had a grievance procedure in place at the prison, (Doc. 74-6 at 18). The response to Plaintiff's inquiries was quite specific: "In order to grieve CMS you would neet (sic) to contact CMS and request information about their complaint/grievance procedures," (*Id.*). This answer suggests that any complaint about treatment rendered by CMS's contract medical care providers or its medical care delivery system was outside the control of prison authorities. *See Peoples v. Corizon Health, Inc.*, 2012 WL 1854730, *2 (W.D. Mo. May 21, 2012) (finding no proof that prisoner's claims "against CMS could have been handled internally within the prison's general grievance procedure" or that responsive action was available through the procedure).

"The Prisoner's Litigation Reform Act (PLRA) requires a prisoner to exhaust all *internal* administrative remedies before filing suit under § 1983." *Pack v. Martin*, 174 F. App'x 256, 259 (6th Cir. March 27, 2006) (citing 42 U.S.C. § 1997e(a)) (emphasis added).

---

[1] Tennessee Department of Correction ("TDOC") Policy No. 501.01 is titled, INMATE GRIEVANCE PROCEDURES, (Doc. 74-6 at 5-10). Policy No. 501.01.VI.H.8 reads: "The grievance process is inappropriate for: Diagnoses by medical professionals . . . ," (*Id*. at 8-9).

All that is really required for an inmate to prove exhaustion of administrative remedies is a showing that he affirmatively endeavored to comply with the administrative grievance process. *Risher v. Lappin*, 639 F.3d 236, 240 -241 (6th Cir. 2011) (declining "to impose requirements on [plaintiff] for exhaustion purposes that go beyond what was specifically required by the [prison's] grievance procedure" and finding that he "was required to follow the regulations, and he did so"); *Napier*, 636 F.3d at 224 ("Our Court has consistently analyzed whether an inmate's efforts to exhaust were sufficient under the circumstances" and "[w]e are not requiring that a prisoner utilize every conceivable channel to grieve their (sic) case . . . ."). Here, Plaintiff has made that showing.

Be that as it may, it remains that *CMS*, the party which moved the Court for summary judgment or for a dismissal of the complaint, did not establish that Plaintiff had an available administrative remedy, through which he could have presented the medical claims asserted in this § 1983 action. CMS is not entitled to summary judgment on this issue because it has not demonstrated "that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a).

## II.      STATUTE OF LIMITATION

The Sixth Circuit's remand required this Court to *inter alia,* determine which discrete unlawful actions by CMS alleged by Plaintiff, if any, took place on or after January 25, 2005. A review of the record clearly reveals Plaintiff has not alleged CMS engaged in any discrete unlawful acts after January 25, 2005.

## A.     Allegations in Original Complaint

Plaintiff's original complaint does not contain factually supported allegations, thus there are no allegations in his original complaint that suffice as "discrete unlawful actions by CMS" taken on or after January 25, 2005, (Doc. 65 at 8).  The allegations in Plaintiff's complaint consist of the following vague and factually unsupported claims: 1) Plaintiff slipped and fell dislocating his hip and twisting his knee; 2) Shortly thereafter, an ambulance was called by medical staff and the ambulance attendant popped his hip back into place when he tightened the gurney straps; 3) since that time, Plaintiff has received minimal and inadequate medical attention; 4) Plaintiff has been deprived of proper medical care to correct his injuries amounting to "extreme negligence . . . [;]" and 5) "[a]s a result of the negligence[,] . . . [he] has suffered extreme pain in his hip and knee . . . causing permanent impairment . . .", (Doc. 1 at 2).

In addition, Plaintiff alleges he was sent to DSNF for unidentified "specific medical needs to correct his injuries."  Plaintiff claimed DSNF failed to follow Dr Foote's instructions, and this failure to follow Dr. Foote's "specific instructions[,]" "medical orders and directions" resulted in Plaintiff "not receiving any medical attention or diagnostic treatment," (*Id.* at 3).[2]  Plaintiff, however, has failed to point to the medical records

---

[2]     Plaintiff's sweeping claim that he did not receive any medical attention or treatment is not supported by the facts in the record.  Considering Defendant provided Plaintiff with 1,529 pages of his medical records, and a person who receives no medical attention or treatment would not accumulate 1,529 pages of medical records, Plaintiff's claim of no medical treatment is disingenuous, (Doc. 72).

containing those "specific instructions, medical orders, and directions," or describe in detail the medical orders to which he is referring.  In addition, Plaintiff's exhibits to his complaint, including his hand-written diary, clearly demonstrate he did indeed receive medical treatment–actually, a considerable amount of treatment—but do not demonstrate Dr. Foote's medical orders and instructions were not followed, (Doc. 1-1 at 10-19).

**B.  Sixth Circuit's Remand and Plaintiff's Submissions Pursuant to the Order**

At the outset, there is one matter in the Sixth Circuit's remand order which needs to be clarified.  Contrary to Plaintiff's contention, the Sixth Circuit concluded the continuing violation theory does not apply in this case and directed the Court to determine which discrete unlawful actions by CMS took place after January 25, 2005. Therefore, because the Plaintiff's complaint does not contain any allegations meeting the Sixth Circuit's criteria, the Court looks to Plaintiff's subsequently filed response to CMS's motion for summary judgment for the allegations of unlawful conduct.   In that filing, the Court discerns Plaintiff is contending that the following events occurred after January 25, 2005, but before January 25, 2006, the date on which he filed this lawsuit: [3]

> On April 11, 2005, Dr. Higgs inquired Albert Thibeaux, M.D. from International Radiology Group, LLC from Dallas Texas for a second opinion regarding Bruce's right knee.  Dr. Thibeaux was of the opinion, (comparison to the May 24, 2004 study), that Bruce had moderately "*severe degenerative changes in the knee and also noted considerable widening of the medial joint*

---

[3]    The date stamped on the envelope by the prison post office reflects it was mailed on January 25, 2006.

*space which may indicate ligamentoud injury."* On June 1, 2005, Dr. Higgs
again inquired Dr. Thibeaux for an additional study of the right knee. Dr.
Thibeaus findings were that "*there is genu valgus deformity and degenerative
changes in the knee." (Exhibit 2, at 32-33).* From that point on, Bruce's knee
continued to worsen and became more painful. Bruce would only receive pain
medication, crutches, raps [sic], ice & heat packs, and a cane despite his knee
becoming severe DJD. (*Exhibit 4, at 3-31).*

(Doc. 74 at 6-7). In a footnote, Plaintiff claims he was transported back and forth to DSNF

often where he received no medical treatment for his swollen and deformed knee until June

19, 2007, when he finally received a total knee replacement, (*Id*. at 7 n.3). The records

before the Court reflect Plaintiff continuously sought and received medical treatment for his

knee and other medical problems  through March of 2007, which is the latest medical record

submitted by Plaintiff,  (Doc. 74-1 through 74-4).

###    C.    Applicable Law

A prisoner states a claim of cruel and unusual punishment under the Eighth

Amendment by alleging prison officials were deliberately indifferent to his serious medical

condition, or that prison officials have, with deliberate indifference, exposed him to

conditions "that pose an unreasonable risk of serious damage to [the inmate's] future health."

*Helling v. McKinney*, 509 U.S. 25, 35 (1993); *Estelle v. Gamble*, 429 U.S. 97, 103 (1976).

To demonstrate an Eighth Amendment violation, a plaintiff must meet both the objective and

subjective component of the test.

In order to support a § 1983 claim for a constitutional violation of his right to medical

care, Plaintiff must show that he had an objectively serious medical condition; Defendant

knew of the condition and was deliberately indifferent to treating him; and this indifference

caused him some injury. *See Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are serious." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (internal punctuation and citation omitted).

An objectively serious medical condition is one that "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008). "A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010) (citation omitted). Thus, "where denial or delay causes an inmate to suffer a life-long handicap or permanent loss, the medical need is considered serious." *Monmouth County Correctional Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3rd Cir. 1987) (collecting cases).

With respect to the subjective component, to demonstrate deliberate indifference, an inmate must show that the prison official knew of and disregarded an excessive risk to inmate health or safety. *Farmer v. Brennan*, 511 U.S. 825, 835-840 (1994). Deliberate indifference may be "manifested by prison doctors in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble*, 429 U.S. 104-05.

11

**D.     Analysis**

The Sixth Circuit directed this Court to "determine which discrete unlawful actions by CMS alleged by [Plaintiff], if any, took place on or after January 25, 2005," (Doc. 65 at 8).  Before proceeding to that task, however, the Court is compelled to clarify the record as it appears that both Plaintiff and the Sixth Circuit are under the misconception that a physician ordered surgery on Plaintiff which he was denied until 2007.  As explained below, there is no such evidence in the record before this Court.

1. *No Physician Ordered or Recommended Surgery That was not Performed*

The Sixth Circuit stated, in its opinion, that "[i]n this case, there was evidence in the record showing that the needed surgery was not performed until 2007, and that Plaintiff was denied necessary surgery through this time," (*Id*. at 7).[4]  The Court has carefully reviewed Plaintiff's submissions of his medical records and finds no such evidence.

Contrary to any inference in Plaintiff's complaint and filings, and the Sixth Circuit's remand order, there is no evidence that any physician diagnosed a need for Plaintiff to have hip or knee surgery prior to the July 1, 2004, recommendation that Plaintiff needed orthoscopic surgery which was performed shortly thereafter on July 16, 2004.[5]  Plaintiff has

---

[4]     The Court is unable to locate any medical records regarding the alleged 2007 surgery or any records indicating when a physician originally ordered the surgery.

[5]     On July 1, 2004, Dr. Limbird recommended surgery, specifically an examination under anesthesia and an arthroscopic evaluation of the inside of Plaintiff's knee.  Although he speculated Plaintiff would require arthroplasty in the future, he did not believe it was "prudent to consider that at this time," (Doc. 74-2 at 11, 16-17).  On July 16, 2004, Plaintiff underwent right knee arthroscopy and debridement surgery and he tolerated the procedure well, (*Id*. at 21).

12

not directed the Court's attention to any document or other credible evidence where a physician recommended or ordered surgery on Plaintiff's right hip or knee prior to when the surgery was performed on his knee in July of 2004. Moreover, the Court's careful review of Plaintiff's submissions reveals there is no such order in Plaintiff's medical records.

Other than the July, 2004 surgery, the medical records Plaintiff provided in response to the motion for summary judgment simply do not support a finding that any physician prescribed surgery for Plaintiff's knee and hip prior to January 23, 2006, the date on which he filed this complaint, (Doc. 74-3). Rather, as explained below, it appears Plaintiff has misconstrued simple comments referring to a possible future need for surgery in his medical records as a diagnosis and order for surgery.

The medical records reflect Plaintiff received treatment for the injuries he sustained on September 18, 2002, the date on which Plaintiff was initially injured. Notably, the medical record reflects the presumed diagnosis was a fractured right hip, (Doc. 74-1 at 5). However, the subsequent treatment did not support such a diagnosis. The medical report evidencing his initial treatment reflects, as best as the Court can discern, that both his knee and hip were x-rayed, with negative results, though there was evidence of "some hypertrophic changes in the knee joint region demonstrated." It further appears Plaintiff' right thigh muscle was strained and that he received an injection of medication, (*Id*. at 7-9). On October 14, 2002, a study of Plaintiff's right hip showed "usual right hip joint space widths[,] . . . no evident fracture or dislocation[,] . . . bony pelvic ring . . . intact, and visualized sacrum and S1 joints are unremarkable," (*Id.* at 11). A January 13, 2003, study

13

of Plaintiff's right hip revealed the same findings and a conclusion that Plaintiff had a "[n]ormal right hip," *(Id.* at 14). Plaintiff apparently continued to complain about pain in his right hip and he was referred for an orthopedic consultation to DNSF for a March 13, 2003, appointment, (*Id.* at 18).

Both of Plaintiff's hips were x-rayed on March 13, 2003, and although he had pain, ambulated with a limp, and used a cane, neither hip showed any abnormality. It was recommended that avascular necrosis of the hips be ruled out and an MRI scan was recommended, (*Id.* at 23-24). Plaintiff had an MRI on May 6, 2003, of his left hip which was compromised due to him moving during the test, but the MRI revealed no evidence of fracture or dislocation, (*Id.* at 34).[6] Similarly, on July 2, 2003, his right knee was x-rayed, but once again it appears Plaintiff failed to follow instructions as the examination was "somewhat limited due to patient's lack of cooperation and rotation of the film." Although there were "degenerative changes in the knee with osteophyle formation as well as narrowing of the three compartments of the knee[,] . . . [and] probably partial obliteration of the suprapatellar fat pad indicating joint effusion[,]" there was no evidence of fracture or dislocation, (Doc. 74-1 at 45-46).

In the consultation request dated July 21, 2003, there is a note in the comment section that Plaintiff "probably will require total hip replacement at some point in the future." (*Id.* at 52). The Court presumes this is what Plaintiff and the Sixth Circuit relied upon to support

---

[6] Although an MRI was not performed at that time, Plaintiff submitted records indicating he received an MRI on his right hip on August 19, 2003, (Doc. 74-1 at 55, 62).

the contention that Plaintiff was denied necessary surgery. This comment, however, is just that, a speculative comment, not a diagnosis or recommendation that total hip replacement surgery was necessary at that time. Similarly, on May 12, 2004, Plaintiff sought medical treatment for a problem he had been experiencing with his knee for about one week. There was a comment on the consultation request–"probably needs surgical intervention." Again, this is not a diagnosis or recommendation but rather, is only a speculative comment which is not the equivalent of a medical recommendation or order for surgery, (Doc. 74-2 at 4-6).

Although the study performed on Plaintiff's right knee on May 24, 2004, revealed degenerative joint disease, but an otherwise normal right knee, (*Id*. at 3), an orthopedic appointment was scheduled for July 1, 2004, (*Id*. at 6). The provider consultation report, dated July 1, 2004, reflects Plaintiff suffered a knee dislocation which apparently required "urgent surgery," (*Id*. at 11). On July 1, 2004, Dr. Limbird concluded he needed an examination under anesthesia and an arthroscopic evaluation of the inside of his knee, (*Id*. at 16). The surgery was performed on July 16, 2004, debridement of the knee was accomplished, and Plaintiff was diagnosed with arthrofibrosis and degenerative posttraumatic arthritis of the right knee, (*Id*. at 19). In his September 9, 2004, follow-up consultation, Dr. Limbird states the following:

> REVIEW OF CASE: Mr. Bruce was seen for follow-up of his knee. We have now gotten his knee out straight. He has a full range of motion and only when he thinks we are examining his back does he jump with full extension of the knee in the supine and the seated position.
>
> IMPRESSION: He describes a very unusual gait pattern. He walks with his knee bent, hip adducted, and the foot externally rotated. However, he does not

have to walk that way. I can demonstrate quite nicely that his knee is not unstable, that he has exactly the same amount of motion and range as the opposite side and that there is no reason he has to walk in the way he is doing.

PLAN: At this point, I think this is a habitual problem, not related to any significant intraarticular pathology and he is released from further follow-up.

(*Id.* at 33). Accordingly, the record clearly reflects Plaintiff was not denied any recommended surgery and once surgery, in fact, was recommended, he received the surgery in less than three weeks.

2. *No Alleged Discrete Unlawful Actions after January 25, 2005*

To properly allege a discrete unlawful act, Plaintiff must allege Defendant deliberately denied him treatment for his serious medical condition. While the nature of Plaintiff's hip and knee conditions are not entirely clear from the record, as it appears Plaintiff has re-injured himself on more than one occasion and that all of his medical records pertaining to these conditions are not before the Court, it appears from the record, that his hip and knee conditions constitute a sufficiently serious medical need to meet the objective requirement of his Eighth Amendment claim. With respect to the subjective component, Plaintiff must demonstrate CMS acted with deliberate indifference. This is where Plaintiff falls short.

To demonstrate deliberate indifference, an inmate must show that the prison official knew of and disregarded an excessive risk to inmate health or safety. *Farmer v. Brennan*, 511 U.S. at 835-840. Deliberate indifference may be "manifested by prison doctors in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble*, 429 U.S. 104-05.

16

Generally, once a prisoner has actually been given treatment and the dispute is over the adequacy of such treatment, such dispute does not state a cognizable § 1983 claim. *Estelle v. Gamble*, 429 U.S. at 105-06. A difference of opinion between a prisoner and prison medical staff regarding the treatment or diagnosis of a medical condition does not constitute deliberate indifference. *Johnson v. Stephan*, 6 F.3d 691, 691 (10th Cir. 1993). Even if the medical personnel's opinion is inaccurate and treatment is unsuccessful, mere negligence or allegedly poor medical judgment does not constitute cruel and unusual punishment. *Estelle v. Gamble*, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Self v. Crum*, 439 F.3d 1227, 1233 (10th Cir. 2006) ("The negligent failure to provide adequate medical care, even one constituting medical malpractice, does not give rise to a constitutional violation. So long as a medical professional provides a level of care consistent with the symptoms presented by the inmate, absent evidence of actual knowledge or recklessness, the requisite state of mind cannot be met.") (internal punctuation and citations omitted)). Thus, the Court's "subjective inquiry is limited to consideration of the doctor's knowledge at the time he prescribed treatment for the symptoms presented, not to the ultimate treatment necessary." *Id.*

Although Plaintiff did not submit his more than 1500 pages of medical records, what he has submitted demonstrates CMS was consistently treating all of Plaintiff's alleged medical issues. Indeed, Plaintiff admits he was given ace wraps, ice, heat, and pain pills to treat his sore hip and knee. Although conflicting claims have been presented, the Court discerns Plaintiff concedes Defendant provided him with some degree of medical attention,

17

but he apparently argues surgery should have been performed earlier. Decisions of this nature, however, traditionally fall within the scope of a physician's medical judgment and are, therefore not actionable under the Eighth Amendment absent a showing of obviousness. *See Self v. Crum*, 439 F.3d at 1232 (inference of deliberate indifference unwarranted where physician orders treatment consistent with the symptoms presented and then continues to monitor patient's condition unless the need for additional treatment is obvious). Plaintiff has failed to plausibly demonstrate that surgery was necessary earlier than it was performed.

Here, there is nothing in the record to indicate Plaintiff's serious medical needs were ignored by CMS. The proof shows Plaintiff was provided medical treatment for his right hip and knee beginning with the calling of an ambulance shortly after he fell, (Doc. 1 at 2); Plaintiff received medical care on an ongoing basis; and he has failed to present any evidence to show a deliberate indifference to his serious medical needs.

Indeed, considering the time period to which the remand applies, *i.e.*, January 25, 2005, until January 25, 2006, it appears, from Plaintiff's submissions, that he received treatment for various ailments including his knee and hip pain throughout 2005 and 2006. Specifically, records reflect Plaintiff consulted with medical and/or received treatment for his knee on January 7, 2005, January 18, 2005, February 17, 2005,[7] March 17, 2005, March

---

[7]    Notably, on February 16, 2005, Plaintiff was observed "working on the yard[]" and "not using cane as instructed by MD et [sic] the nurses." On February 17, 2005, records reflect his knee was about the same, the pain was chronic, and he was continued on the darvocet. (Court File No. 74-4, p. 5).

30, 2005, April 7, 2005,  April 8, 2005, April 11, 2005, April 13, 2005, May 4, 2005, May

26, 2005,[8] June 1, 2005, June 3, 2005, June 13, 2005, June 16, 2005, July 5, 2005, July 21,

2005, September 7, 2005, October 6, 2005, November 21, 2005, December 20, 2005, and

December 18, 2006,[9]  (Doc. 74-4 at 3-5, 7-13, 17-18, 20; 74-2 at 36-38; 74-5 at 6-8).

On April 11, 2005, Dr. Thibeaux's study on Plaintiff's right knee revealed
"[m]oderately severe degenerative changes in the knee. . . . considerable widening of the
medal joint space which may indicate ligamentous injury.  The appearance is unchanged
from previous examination.  No acute fracture is seen," (Doc. 72-4 at 35).   On May 26,
2005, the right hip and knee were x-rayed, (Doc. 74-5 at 7).  A review of the medical records
identified and submitted by Plaintiff reflect that, in relation to the June 1, 2005, study, Dr.
Thibeaux noted, as to Plaintiff's right knee:  "There is genu valgus deformity and
degenerative changes in the knee. No acute fracture or other abnormality identified." (Doc.
74-2 at 36).  As to Plaintiff's right foot and right ankle, Dr. Thibeaux concluded both were
normal, (Doc. 74-2 at 37 & 38).  Mild degenerative joint disease was present in his right hip
but otherwise the study was normal, (Doc. 74-2 at 39).  Plaintiff claims and the medical
records reflect he received pain medication, crutches, wraps, ice and heat packs, and a cane.
Specifically, Plaintiff was receiving darvocet prior to January 2005 and continued receiving
pain medication and treatment beyond the time he filed this lawsuit, (*Id*. at 40; Doc. 74-4).

---

[8]     Plaintiff had both his of right hip and knee x-rayed.

[9]     Plaintiff had a physical and it was noted that the darvocet was working.

Although Plaintiff alleges he was denied proper medical treatment for his right hip and knee, the medical records clearly reveal that he was being treated for these medical conditions, (Docs. 74-1 through 74-5). While incarcerated, Plaintiff received medical treatment for his right hip and knee on a regular basis and he has failed to allege, much less demonstrate that CMS was deliberately indifferent to his serious medical needs. In addition, the affidavit of Dr. Paul Alexander, Medical Director of Lois M. DeBerry Special Needs Facility, averring Plaintiff received appropriate medical care during the times in question and such care complied with the acceptable standard of care for the presenting symptomology has not been contradicted (Court File No. 37).

Defendant's decision not to perform surgery at an earlier time was within its discretion as a medical provider, as there is nothing in the record reflecting it was obvious at the time of Plaintiff's treatment that surgery was necessary. Indeed, Plaintiff's ultimate diagnosis is unclear even now, as Plaintiff simply states he received a total knee replacement on June 19, 2007, (Doc. 74 at 7, n. 3). Based on the facts alleged by Plaintiff and supported by his medical records, it is clear CMS provided medical treatment for Plaintiff's injuries, that treatment was provided on a regular basis, and Defendant did not treat Plaintiff's injuries with deliberate indifference. Accordingly, because Plaintiff has not demonstrated Defendant acted with deliberate indifference in relation to treating his medical conditions, the Court concludes Plaintiff has not alleged or presented any evidence demonstrating Defendant committed any discreet unlawful acts on or after January 25, 2005, and this action is time-barred.

## III.    CONCLUSION

Factually unsupported allegations fail to state a cognizable claim under 42 U.S.C. § 1983.  The facts presented simply do not make out a claim for deprivation of federally protected civil rights.  Accordingly, Defendant's motion for summary judgment will be **GRANTED** and Plaintiff's § 1983 complaint will be **DISMISSED WITH PREJUDICE**.  The dismissal of Plaintiff's complaint has rendered all pending motions **MOOT** and they will be **DENIED**, (Docs.  78-79, 85, 87).  The Court will **CERTIFY** that any appeal from this action would not be taken in good faith and would be totally frivolous.  *See* Rule 24 of the Federal Rules of Appellate Procedure.

**AN APPROPRIATE ORDER WILL ENTER.**

_____ s/ Leon Jordan _____
United States District Judge
